## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-cv-21396-CIV-LENARD/O'SULLIVAN

**SOLUTION Z, on behalf of itself and all others similarly situated**,

      Plaintiff,

v.

**ALMA LASERS, INC.,**

      Defendant.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND DENYING DEFENDANT'S MOTION TO STRIKE (D.E. 43)

**THIS CAUSE** is before the Court on Defendant Alma Lasers, Inc.'s ("Alma Lasers") Motion to Dismiss and Motion to Strike ("Motion," D.E. 43), filed on March 14, 2012. On April 6, 2012, Plaintiff Solution Z filed its response in opposition ("Response," D.E. 48), to which Defendant filed its reply ("Reply," D.E. 50) on April 16, 2012. Having considered the Motion, the Response, the Reply, and the record, the Court finds as follows.

**I.    Background**[1]

This case involves claims arising from Defendant's advertising, marketing, and sale

---

[1]    The following facts are gleaned from Plaintiff's Amended Complaint and the exhibits to Plaintiff's Amended Complaint (which includes contract at issue) and are deemed to be true for purposes of Defendant's Motion.

of the Accent XL machine to medical cosmetic laser, implant, plastic surgery, cosmetic dentistry, and/or cosmetic dermatology practices in Florida.  (Am. Compl., D.E. 37, ¶¶ 1, 4, 15, 18.)  Alma Lasers marketed and sold the Accent XL machine for tightening and firming the skin and for use on the skin to produce more collagen through heat and radio frequency.  (Id. ¶¶ 16, 17, 21.)  Due to Alma Lasers' marketing of the machine, Solution Z and other members of the proposed class purchased Accent XL machines during the period between January 2007 through December 2008 for approximately $109,700 to $130,000.  (Id. ¶ 26.)  Solution Z asserts that the Accent XL machine does not produce the results touted by Alma Lasers' sale representatives, written advertisements, and website.  (Id. ¶ 27.)

On March 25, 2011, Solution Z filed a class action complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. Alma Lasers removed the case to this Court on April 20, 2011.[2]  (See Notice of Removal, D.E. 1, at 2-4.)  On April 27, 2011, Alma Lasers filed a motion to dismiss the complaint (D.E. 4), which the Court granted on January 25, 2012 (Order, D.E. 35).  Solution Z filed its amended class action complaint on February 14, 2012.  (See Am. Compl., D.E. 37.)  In its Amended Complaint, Solution Z alleges the following seven counts against Alma Lasers: (1) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); (2) false advertising; (3) fraud/misrepresentation in a tort; (4) breach of contract; (5) breach of express warranty; (6)

---

[2]        Jurisdiction is based on diversity of citizenship, pursuant to 28 U.S.C. § 1332. Solution Z and all members of the proposed class are residents and citizens of Florida, Alma Lasers is a Delaware corporation with its principal place of business in Illinois, and the amount in controversy exceeds $75,000, as Plaintiffs seek over $1,000,000 in damages.  (Am. Compl. ¶¶ 2-6.)

breach of implied warranty of merchantability; and (7) breach of implied warranty of fitness for a particular purpose.  (Am. Compl. ¶¶ 1, 38-122.)  Solution Z claims that as a result of patient dissatisfaction with the Accent XL machine for failure to delivered promised results, Solution Z "has given refunds for treatment, lost patients, and damaged its reputation in the cosmetic laser industry."  (Id. ¶ 32.)  Plaintiff requests actual and punitive damages, injunctive relief, and reasonable attorney's fees and costs.  (Id. ¶ 125.)

On March 14, 2012, Alma Lasers moved to dismiss the amended complaint because: (1) the contract clearly outlines the terms and conditions of the sale, so it was unreasonable as a matter of law for Solution Z to rely on Alma Lasers' website, advertisements, or oral representations; (2) the contract's provisions limiting remedies are not unconscionable; (3) the contract of sale is fully integrated with no latent ambiguities and clearly contains various limited warranties and disclaimers; (4) the terms and warranties Solution Z claims were breached by Alma Lasers do not appear anywhere in the contract; (5) Alma Lasers has made a valid disclaimer of any implied warranties by its execution of the contract; and (6) Solution Z fails to meet the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure for the fraud-based causes of action.  (Motion 3-17.)  In the alternative, Alma Lasers moved to strike Plaintiff's demand for incidental and consequential damages pursuant the express language of the warranty.  (Id. at 17-18.)

In response, Solution Z makes the following arguments: (1) the allegations supporting its fraud-based claims meet the heightened pleading standard of Rule 9(b) because the

"Amended Complaint specifically describes the when, where, by whom, and what the representations were"; (2) its contract claims are not precluded by the sales contract and the Court should consider parol evidence because the contract is not fully integrated, clear, and unambiguous; (3) the contract contains implied warranties of merchantability and fitness for a particular purpose; (4) Defendant cannot waive the warranty of merchantability and Defendant's representations in its advertisements and marketing material constitute express warranties of merchantability; (5) Defendant's limited warranty provisions and disclaimers are unconscionable; (6) Plaintiff justifiably relied on Defendant's advertisements, marketing materials, and statements by its representatives because Defendant's representations were not directly contradicted by the terms of the contract; and (7) the cases cited by Defendant all concerned oral misrepresentations which were directly contradicted by the terms of the contract, and in this case Defendant made both oral and written misrepresentations. (See Response 5-19.) Plaintiff did not make any argument related to Defendant's Motion to Strike.[3]

In its Reply, Alma Lasers makes the following arguments: (1) because Plaintiff did not provide details as to what results were guaranteed by Defendant and how the Accent XL system failed to produce these results, Plaintiff has not met its pleading burden; (2) the parol

---

[3]    At the end of the Response, Plaintiff "request[ed] for [the Court] to hold a hearing on this matter as there are several facts and science at issue that Plaintiff believes need to be heard in order to get a full understanding of the issues herein."   (Response 20.)   The Court has reviewed the briefs and the amended complaint and finds that a hearing is not necessary at this time.

4

evidence rule and doctrine of merger bar Plaintiff's claims of misrepresentation arising out of a fully integrated sales contract; (3) the provisions in the contract are not procedurally and substantively unconscionable; and (4) the limited warranties and disclaimers in the contract are valid and enforceable under Florida law.  (Reply 2-11.)

## II.    Legal Standards

The Federal Rules of Civil Procedure generally require a plaintiff to set forth in its complaint a "short and plain statement of his claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citing Conley v. Gibson, 355 U.S. 41, 47 (1957); FED. R. CIV. P. 8(a)(2)).  However, in claims involving fraud, "a party must state with particularity the circumstances constituting fraud."  FED. R. CIV. P. 9(b).  "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."  Ziemba v. Cascade Intern., Inc., 256 F.3d 1194, 1202 (11th Cir. 2001).  In evaluating a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts adopt a "two-pronged approach" whereby they first (1) eliminate any allegations in the complaint that are merely legal conclusions and then (2) where there are well-pleaded

factual allegations, "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (citing Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009)).

## III.    Discussion

### A.    Choice-of-Law Issues

Plaintiff alleges four contract claims (Counts 4 through 7[4]) and three tort claims (Counts 1 through 3[4]).  The contract at issue contains the following choice-of-law provision: "THIS CONTRACT AND THESE TERMS AND CONDITIONS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAWS OF THE STATE OF ILLINOIS (WITHOUT REFERENCE TO THE PRINCIPLES OF CONFLICTS OF LAWS)."  (Am. Compl. Ex. J, D.E. 37-10, at 5.)  Neither Party provided in their briefs a discussion of this choice-of-law provision and its effect on the contract and tort claims; instead, the Parties

---

[4]    The contract claims are: breach of contract (Count 4), breach of express warranty (Count 5), breach of implied warranty of merchantability (Count 6), and breach of implied warranty of fitness for a particular purpose (Count 7).  Courts have noted that express and implied warranty claims "are in the nature of contract."  David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d 1309, 1315 (S.D. Fla. 2009) (citing Brisson v. Ford Motor Co., 602 F. Supp. 2d 1227, 1230 (M.D. Fla. 2009) ("An express warranty has long been recognized as 'bargained-for terms of a contractual agreement' and therefore in the nature of a contract."); Rose v. ADT Sec. Servs., Inc., 989 So. 2d 1244, 1248 (Fla. 1st DCA 2008) ("With regard to the breach of warranty claims, in Florida there are two parallel but independent bodies of products liability law.  One, strict liability, is an action in tort; the other, implied warranty, is an action in contract.").

[4]    The tort claims are: violation of the FDUTPA (Count 1), false advertising (Count 2), and fraud/misrepresentation in a tort (Count 3).

appear to have assumed that Florida law applies to all of Plaintiff's claims.[5]  However, in order to properly evaluate the Motion to Dismiss, the Court must determine which state's law applies to Plaintiff's claims.

In a suit where the federal court's subject matter jurisdiction is based on diversity, such as this one, the forum state's choice-of-law rules determine the applicable substantive law.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  "Under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration."  Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc., 92 F.3d 1110, 1115 (11th Cir. 1996) (citing Dep't of Corr. v. McGhee, 653 So. 2d 1091, 1092-93 (Fla. 1st DCA 1995), aff'd, 666 So. 2d 140 (Fla. 1996); Colhoun v. Greyhound Lines, Inc., 265 So. 2d 18, 21 (Fla. 1972)).  For contract claims, Florida courts generally adhere to a contract's choice-of-law provisions.  See Mazzoni Farms, Inc. v. E.I. DuPont de Nemours & Co., 761 So. 2d 306, 311 (Fla. 2000) (noting that a contract's "choice-of-law provision is presumptively valid").  "Under Florida law, courts will enforce 'choice-of-law provisions unless the law of the chosen forum contravenes strong public policy.'"  Maxcess, Inc. v. Lucent Techs., Inc., 433 F.3d 1337, 1341 (11th Cir. 2005) (quoting Mazzoni Farms, 761 So. 2d at 311) (citing Burroughs Corp. v. Suntogs of Miami, Inc., 472 So. 2d 1166,

---

[5]       In its Motion, Defendant includes a brief footnote stating that "Plaintiff's claim under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) is barred by the choice of law provision in the Contract," but that "this Court need not make a choice of law determination at this time, as the Court can properly dismiss the Amended Complaint because all of Plaintiff's claims fail even under the Florida law it proffered."  (Motion 3 n.1.)

1167-69 (Fla. 1985)).  "[T]he countervailing public policy must be sufficiently important that it outweighs the policy protecting freedom of contract."  Mazzoni Farms, 761 So. 2d at 312. The burden is on the "party seeking to avoid enforcement of the provision to show that the foreign law contravenes public policy of the forum jurisdiction."  Id. at 311 (citation omitted).

Here, the contract provides that the terms and conditions of the contract are governed by and construed according to Illinois law.  (See Am. Compl. Ex. J, D.E. 37-10, at 5.)  This choice-of-law provision is "presumptively valid" unless a party can show that Illinois law contravenes Florida's public policy.  Mazzoni Farms, 761 So. 2d at 311.  Although both Parties have cited solely to Florida law in their briefs, neither Party has argued that the law of Illinois contravenes Florida's public policy.  Accordingly, neither Party has provided the Court with any reason for applying Florida law to Plaintiff's contract claims.  Therefore, the Court finds that the choice-of-law provision in the contract is valid and that Illinois law applies to Plaintiff's contract claims.  Neither Party cited to or applied Illinois law in their arguments on Plaintiff's contract claims.  Defendant appears to argue that the Court need not decide the choice of law issue at this time because the result of the contract claims is the same under Florida and Illinois law.  (See Motion 3 n.1.)  However, Defendant did not provide any analysis on this point; for example, Defendant did not show that the states apply the same principles to Plaintiff's four contract claims, nor did Defendant cite to any case law from Illinois in its argument on Plaintiff's contract claims.  Because the Parties failed to brief

8

the applicable law on Plaintiff's contract claims, the Court declines to consider Defendant's arguments on those claims.  See Saregama India Ltd. v. Mosley, 635 F.3d 1284, 1292 n.21 (11th Cir. 2011) ("refrain[ing] from deciding [a] transfer choice-of-law question because the parties have neither fully briefed nor contested this issue" (citing Clark v. Crosby, 335 F.3d 1303, 1313 n.10 (11th Cir. 2003))); see also Thompson v. City of Seminole City Council, No. 8:05-cv-1316-T-24TGW, 2007 WL 2827579, at *7 n.7 (M.D. Fla. Sept. 26, 2007) ("declin[ing] to consider the City's argument that Thompson was not otherwise qualified to perform his job to the extent that he was not able to work with others because that argument was not fully briefed by the parties").  Accordingly, Defendant's motion to dismiss Plaintiff's contract claims is denied.[6]

With regard to Plaintiff's tort claims, the Court first finds that the contract's choice-of-law provision does not apply to those claims.  The choice-of-law provision provides that "[t]his contract and these terms and conditions shall be governed by and construed according to the laws of the state of Illinois."  (Am. Compl. Ex. J, D.E. 37-10, at 5.)  This provision refers only to the contract itself and does not refer to related tort claims.  Accordingly, the

---

[6]    In addition, Defendant moves to "strike Plaintiff's requests for incidental and consequential damages to the extent that Plaintiff asks for such damages in its prayers for relief as a component of compensatory damages."  (Motion 18.)  In support of its request, Defendant states that "Florida courts allow contracts to limit damages recoverable for breach of warranty and breach of contracts," and Defendant then quotes from the language of the limited warranty provision of the contract.  (Id. at 17-18 (quotation omitted).)  However, Defendant did not provide a choice-of-law analysis or any analysis of Illinois law on this issue.  Accordingly, the Court declines to consider Defendant's argument on this issue, and Defendant's motion to strike is denied.

Court finds that the choice-of-law provision is narrow and governs only the scope and the effect of the contract.  See Green Leaf Nursery v. E.I. Dupont de Nemours & Co., 341 F.3d 1292, 1300-01 (11th Cir. 2003) (finding that a similar choice-of-law provision that stated "this release shall be governed and construed in accordance with the laws of the State of Delaware" "calls for the application of the selected law to determine only the scope and effect of the release" and not any related tort claims (citing, inter alia, Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc., 133 F.3d 1405, 1409-10 (11th Cir. 1998); Burger King Corp. v. Austin, 805 F. Supp. 1007, 1012 (S.D. Fla. 1992))).

Because the choice-of-law provision does not apply to the tort claims, the Court turns to Florida's choice-of-law rules to determine the applicable law governing Plaintiff's tort claims.  See Klaxon, 313 U.S. at 496.  "Florida utilizes the 'most significant relationship' test to determine which state's laws applies to tort claims."  Green Leaf Nursery, 341 F.3d at 1301 (citing Garcia v. Pub. Health Trust of Dade Cnty., 841 F.2d 1062, 1064-65 (11th Cir. 1988)).  This test is set forth in the Restatement (Second) of Conflicts of Laws.  See Trumpet Vine Invs., 92 F.3d at 1115-16 (citing Bishop v. Fla. Specialty Paint Co., 389 So. 2d 999, 1001 (Fla. 1980)).  For claims related to the torts of fraud and misrepresentation, Florida courts apply Section 148 of the Restatement (Second) of Conflicts of Laws.  Id. at 1118; see also Walewski v. ZeniMax Media, Inc., No. 6:11-cv-1178-Orl-28DAB, 2012 WL 834125, at *7 (M.D. Fla. Jan. 30, 2012).  Section 148 provides, in relevant part, as follows:

> When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance

took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 148(1).

Here, Plaintiff and members of the proposed class are residents of Florida. (See Am. Compl. ¶¶ 2, 4.) Defendant is incorporated in Delaware and has its principal place of business in Illinois, but Defendant has an office in Fort Lauderdale, Florida and a registered agent in Plantation, Florida. (Id. ¶ 5.) Plaintiff alleges that representatives for Defendant advertised, made statements, and distributed marketing materials to Plaintiff in Florida to induce Plaintiff and proposed class members to sign a contract to purchase the Accent XL machine (id. ¶ 45), and that Defendant sold twenty-five Accent XL machines to Plaintiff and proposed class members in Florida (id. ¶ 35). Plaintiff asserts that the Accent XL machine was used in Florida and that the "machine caused damages to persons and property within Florida." (Id. ¶ 7.) The only contact this case has with Illinois is that Illinois is the location of Defendant's principal place of business. (Id. ¶ 5.) Accordingly, the Court finds that Florida has the most significant contacts and relationship to Plaintiff's fraud claims, and that Florida law therefore governs Plaintiff's fraud claims.[7] Because the Parties briefed the

---

[7]     Some courts have applied Section 145 of the Restatement (Second) of Conflicts of Laws, which relates to general tort claims, to FDUTPA claims. See, e.g., Dart Indus., Inc. v. Acor, No. 6:06-cv-1864-Orl-28DAB, 2008 WL 4816612, at *13 (M.D. Fla. Nov. 5, 2008). Section 145 of the Restatement provides that "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles

correct law on Plaintiff's fraud claims, the Court now turns to the merits of the claims.

**B.    Count 1: Violation of the Florida Deceptive and Unfair Trade Practices Act**

In Count 1, Solution Z alleges that Alma Lasers violated the FDUTPA by "providing deceptive advertisements and other written materials of the Accent XL machine and . . . misleading oral statements of Alma Lasers' representatives of the Accent XL machine," which "equals deceptive, unconscionable and unfair conduct of Alma Lasers' trade or commerce." (Am. Compl. ¶ 43.)  The FDUTPA states, "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." FLA. STAT. § 501.204(1). "Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA:  (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." KC Leisure, Inc. v. Haber, 972 So. 2d 1069, 1073 (Fla. 5th DCA 2008); see also Lustig v. Bear Stearns Residential Mortg. Corp., 411 F. App'x 224, 225 (11th Cir. 2011) (per curiam) (citations omitted) (listing the same elements). "The conduct considered to be a deceptive or unfair for the purposes of a FDUTPA claim

---

stated in § 6." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1)).  "Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Id. § 145(2)).  Even if this section applies to FDUTPA claims, the Court finds that for the same reasons listed above, Florida has the most significant relationship to the claim and therefore Florida law applies to the claim.

may be defined by '[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices.'" Siever v. BWGaskets, Inc., 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009) (quoting FLA. STAT. § 501.203(3)(c)). "Generally, the standard for proving the existence of a deceptive act is different than the standard for proving an unfair practice." Hill v. Hoover Co., No. 1:06-CV-00096-SPM, 2012 WL 4510855, at *4 (N.D. Fla. Oct. 1, 2012). "Deception occurs 'if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'" Silver v. Countrywide Home Loans, Inc., 483 F. App'x 568, 571 (11th Cir. 2012) (quoting Zlotnick v. Premier Sales Grp., Inc., 480 F.3d 1281, 1284 (11th Cir. 2007)). To determine whether the act is "likely to mislead the consumer acting reasonably in the circumstances," the Court considers "the plaintiff's knowledge and level of sophistication." James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecomms., Inc., 275 F.R.D. 638, 645 (M.D. Fla. 2011) (citing Pop's Pancakes, Inc. v. NuCO2, Inc., 251 F.R.D. 677, 686 (S.D. Fla. 2008); Egwuatu v. S. Lubes, Inc., 976 So. 2d 50, 53-54 (Fla. 1st DCA 2008)). "[A]n unfair practice . . . is 'one that offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" Hetrick v. Ideal Image Dev. Corp., 372 F. App'x 985, 992 (11th Cir. 2010) (per curiam) (second ellipsis in original) (quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003)). "[T]he FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct"; however, "the plaintiff must prove

13

that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" Cold Stone Creamery, Inc. v. Lenora Foods I, LLC, 332 F. App'x 565, 567 (11th Cir. 2009) (per curiam) (quoting State, Office of the Att'y Gen., Dep't of Legal Affairs v. Commerce Commercial Leasing, LLC, 946 So. 2d 1253, 1258 (Fla. 1st DCA 2007)). "This standard requires a showing of probable, not possible, deception that is likely to cause injury to a reasonable relying consumer.'" Silver, 483 F. App'x at 571 (quoting Zlotnick, 480 F.3d at 1284).

Defendant argues that Plaintiff's reliance on any oral or written representations was unreasonable because those representations contradict the express terms of the contract. (See Motion 3-7.) With regard to prior oral representations, Florida courts consistently find that "[w]here a plaintiff relies on oral statements at variance with written documents he or she has signed, the plaintiff's reliance is not reasonable as a matter of law." Indulgence Yacht Charters Ltd. v. Ardell Inc., No. 08-60739, 2008 WL 4346749, at *7 (S.D. Fla. Sept. 16, 2008) (citing Garcia v. Santa Maria Resort, Inc., 528 F. Supp. 2d 1283, 1295 (S.D. Fla. 2007); Zlotnick, 431 F. Supp. 2d at 1295; Rosa v. Amoco Oil Co., 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003) ("A party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract.")); see also Dorestin v. Hollywood Imports, Inc., 45 So. 3d 819, 825 (Fla. 4th DCA 2010) ("A FDUTPA claim cannot be stated based upon oral representations which are in contradiction of written terms of a contract, because reliance on such representations is unreasonable as a matter of

14

law." (citing Mac-Gray Serv., Inc. v. DeGeorge, 913 So. 2d 630, 634 (Fla. 4th DCA 2005))).

In contrast, Florida law does not appear settled with regard to prior written representations that contradict a subsequent contract in the context of a FDUTPA claim. Defendant has not cited to – and the Court has not found – any Florida state court case addressing a FDUTPA claim that holds that when a plaintiff relies on prior written representations that contradict statements made in a subsequent contract, the plaintiff's reliance is not reasonable as a matter of law.  However, a federal court has found that a plaintiff was unreasonable as a matter of law in relying on a development brochure and oral misrepresentations because the plaintiff signed a contract "whose terms contradict[ed] the alleged misrepresentations."  Century Land Dev., L.P. v. FFL Dev., LLC, No. 07-14377-CIV, 2008 WL 1850753, at *4 (S.D. Fla. Apr. 24, 2008) (citing Rosa, 262 F. Supp. 2d at 1368).  The Century Land Court concluded that because the contract's "terms were sufficiently clear and in complete conflict with the alleged misrepresentations," "Plaintiff's actions [were] unreasonable and prevent recovery under FDUTPA." Id.  Another federal court suggested that in examining a FDUTPA claim courts use the same analysis for prior written misrepresentations as they would for prior oral misrepresentations that contradict the express terms of a subsequent contract.  See Hayes v. Marriott Ownership Resorts, Inc., No. 6:08-cv-180-Orl-19KRS, 2008 WL 2783365, at *3-5 (M.D. Fla. July 17, 2008).  The Hayes Court compared the written marketing brochures and floor plans to the purchase contract and found that "the purchase contract at issue does not expressly contradict the alleged

misrepresentations." Id. at *4-5.  Based on this comparison of the written misrepresentations to the contract and an examination of the record, the Hayes Court concluded that there was nothing in the record "that would render Plaintiffs' reliance on Marriott's alleged representations unreasonable as a matter of law" and denied the motion to dismiss the FDUTPA and other "fraud-related claims."  See id.

In addition, in a case raising claims under the Florida False Advertising Statute and the Interstate Land Sales Disclosure Act, another federal court found that "a contracting party may not, as a matter of law, reasonably rely upon prior written or oral misrepresentations expressly contradicted by a subsequent written agreement."  Weaver v. Opera Tower, LLC, No. 07-23332-CIV, 2008 WL 4145520, at *2 (S.D. Fla. Aug. 1, 2008) (citing, inter alia, Barnes v. Burger King Corp., 932 F. Supp. 1420, 1428-29 (S.D. Fla. 1996) (addressing a fraud in the inducement claim and finding that reliance on written representations unreasonable as a matter of law where the prior "representations were not contained in the subsequent written agreement between the parties")).  In Weaver, the plaintiff conceded that reliance upon prior oral misrepresentations was unreasonable as a matter of law, but argued that reliance upon prior written misrepresentations was reasonable.  See id. at *2 n.6.  In addressing the argument, the court stated that "the Court fails to find any meaningful distinction between prior oral and written representations for the purposes of the instant analysis."  Id.  The Weaver Court then found that "while the Brochure undoubtedly contains various promotional statements, such representations are expressly contradicted and

16

superseded by [the purchase agreement]," which stated that the building "would be constructed pursuant to the express terms of the Agreement, rather than the Brochure or any other promotional material." Id. at *2. Because the express terms of the parties' written agreement contradicted the language of the brochure and the other promotional materials, the Weaver Court concluded that the plaintiffs "could not have reasonably relied, as a matter of law, on the alleged misrepresentations contained in the Brochure." Id.

The Court agrees with the reasoning in Weaver and the analyses in Century Land and Hayes and finds that where a plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim.[8] "Courts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." Indulgence Yacht Charters, 2008 WL 4346749, at *7 (citing Garcia, 528 F. Supp. 2d at 1296; Zlotnick, 431 F. Supp. 2d at 1295; Rosa, 262 F. Supp. 2d at 1368-69).

---

[8]    Similarly, another court looked beyond FDUTPA cases in determining that reliance on oral representations that contradict a later written agreement was unreasonable as a matter of law. The first FDUTPA case to find that reliance on prior oral representations that were contradicted by the express terms of the contract was unreasonable as a matter of law was Rosa v. Amoco Oil Co., 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003); see Dorestin, 45 So. 3d at 831-32 (Gross, C.J., concurring) (discussing the history of this statement made in Rosa). In Rosa, the court dismissed the plaintiff's FDUTPA claim, stating that "[a] party has no right to rely upon alleged oral misrepresentations that are adequately covered and expressly contradicted in a later written contract." 262 F. Supp. 2d. at 1368. The Rosa Court cited to Hillcrest Pacific Corp. v. Yamamura, 727 So. 2d 1053, 1056 (Fla. 4th DCA 1999) for this statement. Hillcrest Pacific was not a FDUTPA case; rather, the Hillcrest Pacific Court stated that "[a] party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract" during a discussion on a claim of fraud in the inducement. 727 So. 2d at 1056 (citing two fraudulent misrepresentation cases).

On the other hand, if a claim is not "directly and fully rebutted by express evidence in a governing written contract," courts will uphold that claim.  Id. (denying a motion to dismiss the plaintiff's FDUTPA claim because the "alleged misrepresentations regarding the condition of the Yacht and its suitability for commercial chartering do not contradict the terms of the Agreement" and because "the remaining misrepresentations, specifically regarding Elliott's credentials as a surveyor and the post-sale repairs performed by Sharpe, concern issues outside the scope of the Agreement").  Accordingly, the Court first sets forth the alleged oral and written misrepresentations and then turns to the language of the contract to determine whether these misrepresentations are directly and fully rebutted by the express terms of the contract.

Solution Z alleges that Alma Lasers issued "deceptive advertisements and other written materials" and that Alma Lasers' representatives made "misleading oral statements" about patients' clinical results after receiving treatment with the Accent XL machine and doctors' expected profits from using the machine.  (See Am. Compl. ¶ 43.)  Specifically, Solution Z states that "[f]rom approximately January 2007 through December 2008, Defendant Alma Lasers advertised and represented to its consumers, through its representatives, paid endorsers, and through written materials, that the Accent XL would tighten and firm the skin, produce collagen through heat and radio frequency, and produce certain advertised and stated results."  (Id. ¶ 21.)  Solution Z cites to Exhibits A through H of its Amended Complaint and asserts that Alma Lasers' written advertisements and projections made the following misleading statements:

18

"This revolutionary skin tightening regimen uses advanced radio frequency (RF) technology to treat wrinkles non-invasively.  Multiple clinical studies and thousands of satisfied patients have proved the Accent Your Body treatment's effectiveness in tightening loose skin, promoting healthy collagen production and improving body contours.  Compared to other skin treatment systems you'll see *noticeable results faster*"; "just one or two treatments can produce good results"; "steady improvement with excellent, long-term skin tightening results"; "no more than three to five treatments at two week intervals required"; "skin to tighten right away, results are immediately visible"; "15 days post treatment (5 weeks/2x/wk).  The thickness of the patient's superficial fat has decreased 33 percent and there is a clear demarcation from the deep fat"; "the proforma uses of conservative annual growth rate of: 6%."

(Id. ¶ 44.)  Solution Z also asserts that Alma Lasers provided it "misleading before and after pictures and unrealistic projections of the supposed income derived from the use of the Accent XL."  (Id.)  Solution Z states that the before and after pictures included "pictures after just one treatment by the Accent XL machine, which suggested remarkable differences," and notes that Alma Lasers also posted these pictures on its website.  (Id. ¶ 24 (citing Am. Compl. Ex. A-G).)  The income projections provided by Alma Lasers to Solution Z showed "projections of the supposed income derived from the use of the Accent XL, and these projections illustrate the machine's overhead being met or exceeded by the profits it will bring to consumers."  (Id. ¶ 25 (citing Am. Compl. Ex. H).)  Exhibit H of the Amended Complaint is a "financial model . . . designed to provide a realistic depiction of the potential impact that the Accent XL Volumetric RF Thermotherapy System could have on [the purchaser's] revenues."  (Am. Compl. Ex. H, D.E. 37-8, at CM/ECF p. 4.)

In addition, Solution Z identifies four individuals who were representatives of Alma Lasers or who were paid by Alma Lasers to market, endorse, and/or sell the Accent XL

machine to consumers.  (Id. ¶ 20.)  Solution Z asserts that "Rod Broadway, a representative employee of Alma Lasers . . . made oral statements to Plaintiff and other consumers matter-of-factly stating that the Accent XL machine will show vast permanent improvements in the skin by only one or two treatments using non-invasive heat treatments and that it had proven to be effective with thousands of patients, and further, that the consumers of the Accent XL machine are expected to have a specified amount of profits."  (Id. ¶ 22.)  Solution Z also asserts that "Dr. Macrene Alexiades-Armenakas . . . was paid by Alma Lasers to endorse the Accent XL machine and speak at various seminars from approximately January 2007 through December 2008 regarding the Accent XL machine's efficacy and remarkable results it produces."[9]  (Id. ¶ 23.)

Solution Z alleges that it purchased the Accent XL machine from Alma Lasers, but that the machine "does not perform as intended or as the sales representatives' advertisements and other written materials that were provided to Plaintiff and Class members led the consumers and users to believe."  (Id. ¶ 27.)  Solution Z claims that the Accent XL machine "is scientifically incapable from delivering these results and performing the remedies described" and that Solution Z has not "seen any of the noticeable results that Alma Lasers promised to its consumers."  (Id.)

The six-page contract at issue contains various, general provisions regarding a "limited warranty" and three specific provisions regarding written and oral representations.

---

[9]      Solution Z does not specify the alleged misrepresentations made by Dr. Macrene Alexiades-Armenakas.  (See Am. Compl. ¶ 23.)

The first specific provision is found on the second page of the contract, and states as follows:

> No warranty shall arise from any description of the warranted product or its effectiveness or ability to achieve any particular result(s), whether written or oral, specifications, samples, demonstration units, bulletins, marketing or promotional materials or similar statements made or furnished to Buyer.  Alma makes no warranty or representation of revenue or profits which may be derived from Buyer's use of the warranted product and no such representation or warranty shall arise from projections, studies or other statements or materials given to Buyer prior to or at the time of purchase.

(Am. Compl. Ex. J, at 2.)  The second specific provision is under the "Warranties" provision on page four of the contract, and states as follows:

> Any description of the Products, whether in writing or made orally by Seller or Seller's agents, specifications, samples, models, demonstration units, bulletins, drawings, diagrams, engineering sheets or similar materials used in connection with Buyer's order are for the sole purpose of identifying the Products and shall not be construed as an express warranty.  Any suggestions by Seller or Seller's agents regarding use, application or suitability of the Products shall not be construed as an express warranty unless confirmed to be such in writing by Seller.
>
> Use of the Products requires the exercise of sound medical judgment, and clinical results may vary based on operator skill and experience, individual patient suitability, individual patient response to treatment and other factors.

(Id. at 4.)  The third specific provision is under the "Manuals, Brochures, and Instructions; Training" provision on page five, and states as follows:

> Any and all operating manuals, instructions, brochures, warnings and the like concerning the Products supplied hereunder are supplied as an aid to Buyer and are not represented to be accurate, complete or sufficient for every use or purpose, or for treatment of every patient, in Buyer's clinical setting.

(Id. at 5.)  In addition, the contract states that "these terms and conditions, together with all attachments incorporated herein by reference, shall constitute the entire agreement between

Seller and Buyer with respect to the subject matter hereof," and that "[t]here are no conditions affecting this agreement which are not expressed herein." (Id.)

Solution Z alleges that Alma Lasers made misrepresentations about the expected profits and the results from using the Accent XL machine.  With regard to the alleged misrepresentations about the expected profits, Solution Z alleges that a representative for Alma Lasers made oral statements and that Solution Z was provided with a written financial model about its prospective income after purchasing the Accent XL machine.  (See Am. Compl. ¶¶ 22, 25, Ex. H.)  However, after these alleged misrepresentations were made, Solution Z was given, reviewed, and signed the contract, which clearly states that "Alma makes no warranty or representation of revenue or profits which may be derived from Buyer's use of the warranted product and no such representation or warranty shall arise from projections, studies or other statements or materials given to Buyer prior to or at the time of purchase."  (Am. Compl. Ex. J, at 2.)  Accordingly, with regard to the alleged misrepresentations about the expected profits, the Court finds that these claims are "directly and fully rebutted by express evidence in [the] governing written contract."  See Indulgence Yacht Charters, 2008 WL 4346749, at *7 (citing Garcia, 528 F. Supp. 2d at 1296; Zlotnick, 431 F. Supp. 2d at 1295; Rosa, 262 F. Supp. 2d at 1368-69).  In addition, "[t]he presence of an integration clause and other disclaimers in the . . . contract logically militates against the reasonableness of Plaintiff's reliance on representations made outside of the contract."  Hayes, 2008 WL 2783365, at *4.  Finally, Solution Z's inability to rely on the financial model is further supported by the express language of the model itself.  See Weaver, 2008

22

WL 4145520, at *4 n.10.  The front page of the financial model states, "This analysis is based on customary charges or those that were suggested by the person or organization for whom this report was created.  It does NOT represent the opinions or recommendations of Alma Lasers.  Alma Lasers takes no responsibility for the financial performance of our customers."  (Am. Compl. Ex. H, D.E. 37-8, at CM/ECF p. 4.)  Under these circumstances, it is not likely that a consumer acting reasonably would have been deceived by the alleged misrepresentations made by a representative of Alma Lasers and by the financial model.

With regard to the alleged misrepresentations about the expected results from using the Accent XL machine, Solution Z alleges that a representative for Alma Lasers made oral statements and that Solution Z was provided various advertising materials, including brochures and before and after pictures about patients' expected results after receiving treatment with the Accent XL machine.  (See Am. Compl. ¶¶ 22-24, 44, Ex. A-G.)  However, after these alleged misrepresentations were made, Solution Z was given, reviewed, and signed the contract, which clearly states, in three separate provisions, that "clinical results may vary" and that the marketing materials and oral statements by Alma Lasers' representatives do not create a warranty about the Accent XL machine's "effectiveness or ability to achieve any particular result(s)."  (Am. Compl. Ex. J, at 2, 4.)  The relevant provisions state, in their entirety:

> No warranty shall arise from any description of the warranted product or its effectiveness or ability to achieve any particular result(s), whether written or oral, specifications, samples, demonstration units, bulletins, marketing or promotional materials or similar statements made or furnished to Buyer.

23

. . .

Any description of the Products, whether in writing or made orally by Seller or Seller's agents, specifications, samples, models, demonstration units, bulletins, drawings, diagrams, engineering sheets or similar materials used in connection with Buyer's order are for the sole purpose of identifying the Products and shall not be construed as an express warranty.  Any suggestions by Seller or Seller's agents regarding use, application or suitability of the Products shall not be construed as an express warranty unless confirmed to be such in writing by Seller.

Use of the Products requires the exercise of sound medical judgment, and clinical results may vary based on operator skill and experience, individual patient suitability, individual patient response to treatment and other factors.

. . .

Any and all operating manuals, instructions, brochures, warnings and the like concerning the Products supplied hereunder are supplied as an aid to Buyer and are not represented to be accurate, complete or sufficient for every use or purpose, or for treatment of every patient, in Buyer's clinical setting.

(Id. at 2, 4, 5.)  Accordingly, with regard to the alleged misrepresentations about the expected clinical results, the Court finds that these claims are "directly and fully rebutted by express evidence in [the] governing written contract."  See Indulgence Yacht Charters, 2008 WL 4346749, at *7 (citing Garcia, 528 F. Supp. 2d at 1296; Zlotnick, 431 F. Supp. 2d at 1295; Rosa, 262 F. Supp. 2d at 1368-69).  Furthermore, as with the claims regarding expected profits, "[t]he presence of an integration clause and other disclaimers in the . . . contract logically militates against the reasonableness of Plaintiff's reliance on representations made outside of the contract."  See Hayes, 2008 WL 2783365, at *4.  Finally, the fact that "Plaintiff and the proposed Class members are medical cosmetic laser, implant, plastic surgery, cosmetic dentistry, and/or cosmetic dermatology practices or are individuals

24

employed by such practices," including "medical doctors," (Am. Compl. ¶ 4) further militates against the reasonableness of Plaintiff's reliance on representations made about patients' prospective clinical results after being treated with the Accent XL machine.  See James D. Hinson Elec. Contracting Co., 275 F.R.D. at 645 (considering "the plaintiff's knowledge and level of sophistication" to determine whether a statement is "likely to mislead the consumer acting reasonably in the circumstances").  Under these circumstances, it is not likely that a consumer acting reasonably would have been deceived by the alleged misrepresentations made by a representative of Alma Lasers and by the advertisements and marketing materials.

Because the oral and written misrepresentations were "directly and fully rebutted by express evidence in a governing written contract," the Court finds that Solution Z's reliance on these statements was unreasonable as a matter of law.  See Indulgence Yacht Charters, 2008 WL 4346749, at *7 (citing Garcia, 528 F. Supp. 2d at 1296; Zlotnick, 431 F. Supp. 2d at 1295; Rosa, 262 F. Supp. 2d at 1368-69).  Accordingly, Defendant's motion to dismiss the FDUTPA claim is granted.

### C.   Count 2: False Advertising

In Count 2, Solution Z alleges that "[t]he statements, advertisements, and before and after pictures that were provided by ALMA to Plaintiff and Class members are sufficiently false, deceitful and misleading in order to justify a claim for false advertisement under Florida law."  (Complaint ¶ 36.)  Under Florida law, it is "unlawful for any person to make or disseminate or cause to be made or disseminated before the general public of the state, or any portion thereof, any misleading advertisement."  FLA. STAT. § 817.41(1).  Florida law

defines "misleading advertising" as follows:

> The phrase "misleading advertising" includes any statements made, or disseminated, in oral, written, or printed form or otherwise, to or before the public, or any portion thereof, which are known, or through the exercise of reasonable care or investigation could or might have been ascertained, to be untrue or misleading, and which are or were so made or disseminated with the intent or purpose, either directly or indirectly, of selling or disposing of real or personal property, services of any nature whatever, professional or otherwise, or to induce the public to enter into any obligation relating to such property or services.

FLA. STAT. § 817.40(5). "In order to prove a violation of Section 817.41, Florida law requires the plaintiff to prove reliance on the alleged misleading advertising, as well as each of the other elements of the common law tort of fraud in the inducement." Smith v. Mellon Bank, 957 F.2d 856, 858 (11th Cir. 1992) (citing Vance v. Indian Hammock Hunt & Riding Club, Ltd., 403 So. 2d 1367, 1370 (Fla. 4th DCA 1981)); see also Rollins, Inc. v. Butland, 951 So. 2d 860, 877 (Fla. 2d DCA 2006); Joseph v. Liberty Nat'l Bank, 873 So. 2d 384, 388 (Fla. 5th DCA 2004); Burton v. Linotype Co., 556 So. 2d 1126 (Fla. 3d DCA 1989). "The law is clear that reliance by a party claiming fraud must be reasonable and justified under the circumstances." Smith, 957 F.2d at 858 (citing Uvanile v. Denoff, 495 So. 2d 1177, 1180 (Fla. 4th DCA 1986); Besett v. Basnett, 389 So. 2d 995, 997-98 (Fla. 1980); Butts v. Dragstrem, 349 So. 2d 1205, 1207 (Fla. 1st DCA 1977)). Accordingly, as the Court found for the FDUTPA claim, it was unreasonable for Solution Z to rely on the marketing materials regarding the projected clinical results and the income projections when the representations made in those advertisements were specifically and repeatedly contradicted by the express terms of the contract. See supra Part III.B. Therefore, Defendant's motion to dismiss the

false advertising claim is granted.

### D.    Count 3: Fraud/Misrepresentation

Solution Z alleges that Alma Lasers "misrepresented material facts . . . , such as the effectiveness of the Accent XL machine, to its consumers through advertisements, oral and written statements, and before treatment and after treatment pictures, and projections of income derived from the use of the Accent XL machine."  (Am. Compl. ¶ 66.)  "Under Florida law, a claim for fraudulent misrepresentation has the following elements: (1) a false statement or misrepresentation of a material fact; (2) the representor's knowledge at the time the misrepresentation is made that such statement is false; (3) such misrepresentation was intended to induce another to act in reliance thereon; (4) action in justifiable reliance on the representation; and (5) resulting damage or injury to the party so acting." D.H.G. Properties, LLC v. Ginn Cos., No. 3:09-cv-735-J-34JRK, 2010 WL 5584464, at *5-6 (M.D. Fla. Sept. 28, 2010) (citing Thor Bear, Inc. v. Crocker Mizner Park, Inc., 648 So. 2d 168, 172 (Fla. 4th DCA 1994) (per curiam); Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985)).  "[W]ithout evidence of justifiable reliance there can be no actionable fraud." Fed. Deposit Ins. Corp. v. High Tech Med. Sys., Inc., 574 So.2d 1121, 1123 (Fla. 4th DCA 1991) (citing Mirenda v. Steinhardt, 350 So. 2d 499, 501 (Fla. 4th DCA 1977), cert. denied, 360 So. 2d 1250 (Fla. 1978)).  Accordingly, as the Court found for the FDUTPA claim, it was unreasonable for Solution Z to rely on the oral statements and marketing materials regarding the projected clinical results and the income projections when those representations were specifically and repeatedly contradicted by the express terms of the contract. See supra Part III.B.  Therefore,

27

Defendant's motion to dismiss the fraud claim is granted.

## IV.      Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that, as consistent with this Order:

1.      Defendant's Motion to Dismiss (D.E. 43), filed on March 14, 2012, is

   **GRANTED IN PART AND DENIED IN PART**;

2.      Counts 1, 2, and 3 of the Amended Complaint are **DISMISSED WITH**

   **PREJUDICE**; and

3.      Defendant's Motion to Strike (D.E. 43), filed on March 14, 2012, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida this 22nd day of January,

2013.


**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**